Good morning, Your Honor. May it please the Court, my name is Jihan Thomas. I represent petitioners and I'd like to reserve two minutes rebuttal time. Could you keep your voice up? We ask this Court to reverse the IJ findings that the male petitioner did not establish. One, extraordinary circumstances are a result of his trauma. Because he continued to function, he was not totally incapacitated and was not in any catatonic state. And two, Your Honor, changed circumstances because petitioner experienced persecution in the past and he never left a tranquil home before coming to the U.S. Now the issue before this Court is if a person is experiencing a grief and is suffering stress disorders as a result of a trauma, does he have to be totally incapacitated or in a catatonic state for the exception under ACFR 128.485I to apply? Well, the statute, Your Honor, says serious illness, mental disability or physical disability, including any effects of persecution. So the statute includes effects of persecution, which can also include post-traumatic stress disorders. Now the IJ dismissed the exception for two reasons. One, he said petitioner were able to file an extension of status. And two, their emotional status improved because they had the second chance. Counsel, can I just, I don't even think we have jurisdiction to review this. Maybe you can address that point. Okay, Your Honor. I believe the disputed fact came in from the female petitioner who filed a separate asylum application. The female petitioner was the one that said, I didn't know about the process and also because she was traumatized. But the male petitioner never testified, as a matter of fact, that he did not know about the process. What was admitted as the facts is that they lost their daughter. There was a post-traumatic stress disorder report from Dr. Scalicchi about his condition. Nobody disputed this fact. When the judge said both respondents, I don't believe he had any admitted or historical facts presented to say what the petitioner male knew or didn't know about. So I believe the facts with respect to the male, that's why I'm asking the male petitioner application. We have two separate applications. I do concede that the female created a disputed fact, but I do not believe that the male petitioner has presented any disputed fact for this Court to strip it from jurisdiction. So the IG dismissed it for those two reasons. I believe his conclusion has to be dismissed also on two grounds. First, filing an extension of status does not allow a person who has suffered grief to revisit such issue, write about it, talk about it, or even be questioned about it before an asylum officer. Two, the fact that a person brings another child does not alleviate the trauma that he lost his first child. Can we go back, though, with the male petitioner? Yes. Didn't he also file that, I can't remember what it was, it was an extension of the visa status or something? Yeah, he did file an extension, but like I said, when you file an extension, you just ask to request an extension of your visitor visa. But when you write an asylum application, you want to write about the trauma, discuss about the trauma, revisit the trauma. But the point is that he obviously was together enough to do that. So the IG, I think, found that, well, if he could do that, that he could also have filed the asylum petition. Yes, Your Honor, but what we – our position is that his psychologist said he did not want to discuss any of his traumas. He didn't even want to speak about it to any appropriate professionals. He didn't even want to discuss it, even if we realize he didn't even discuss it in his own declaration. He even, when asked about it in court, he said, I cannot forget the trauma until now. I cannot. I cannot. And he refused to talk about it. So when you request an extension, you don't have to say, I'm requesting an extension because I'm revisiting the effects of the trauma, which he was trying to suppress as a result of his stress disorders. So this is – this is our position. I got you. Okay, Your Honor. And also, with respect to the chain circumstances exception, the IG also denied it for two reasons. First, he said, if they were persecuted in the past, and two, if there was any changes, it should have been the 1998 rights. Also, this exception or his conclusion has to be dismissed. This court has visited in Fekri B. Mukassir and Bahura B. Holder and held, even if the person had feared, even during the first year and had the subjective intent to seek asylum, there still could be a change if there is no objective evidence. And the change that Petitioner Sumolong was referring to is there was 50,000 Christians from his hometown that was forced migrated because they were persecuted by the Muslim extremists. And the record is still incomplete with what was going on with the Muslim, which was documented in Yahoo News and also in Washington Times. Even if we don't have jurisdiction over asylum, the asylum claims, we would have jurisdiction over the withholding claim. Were you going to address withholding? Yes. Okay. So we're position here is that they did suffer past persecution. And my – I would also quote the judge on that. He said, the death of the child cannot be attributed to Petitioner because it's the death of a relative, and an alien cannot claim persecution as to a relative, and by virtue of that persecution assert that he himself was persecuted. We humbly ask this court to reverse why. The death of your own child is the most traumatic event that a parent can suffer. And the fact that the judge dismissed that trauma and said that it's the death of a relative, it's the death of their own child. So, Your Honor, and it happened because they're either Chinese or Christian. Physical harm, Your Honors, can be healed over time, but the loss of your own child will remain with you for life. So we believe that there is past persecution on that. With respect to the treatment of Petitioners, there was an adverse credibility with respect to both the death certificate, which I thoroughly briefed. This is to the mail. Yes, as to the mail. I'll address the treatment in custody. So the judge found three grounds, discrepancy with respect to Mr. Sumolong's testimony, declaration versus what he ate or drank during seven days. But I believe he clearly explained that. He said because he was served dog food and he was given drain water, he did not eat or drink. So that was explained, and we don't believe there's a discrepancy. With respect to his declaration statement that his family provided food versus his testimony, he said that, you know, no food was allowed. I believe it was a minor inconsistency that did not go even to the heart of the claim, which is exactly this court held in St. V. Gonzales who paid the bribe to, you know, to which family members paid the bribe. So we don't believe there was a discrepancy as to that. The third ground was the fact that on the second hearing he testified that he was beaten with a stick versus the first hearing he said he cannot remember. But when we look at his declaration, he said he was mistreated in many other ways. On the first hearing when asked what happened, he said, yeah, I was mistreated. He did not deny. I just cannot think. I don't want to remember. It brings the pain. So the court did not disregard completely that this person is suffering from stress disorders and he's not trying to or does not want to revisit his pain. So we believe there is no any adverse credibility in his treatment, lack of, you know, necessities, his detention, just because he's Chinese or Christian amounts also to past persecution. And I believe I reserve the two minutes, Your Honor. Thank you. Thank you. Good morning. Jessica Sherman on behalf of the Respondent, Eric Holder. Petitioners have not demonstrated that the record compels the finding that they're eligible for asylum, withholding of removal, or protection under the Torture Convention. Maybe you can just start with the jurisdictional point. With the jurisdictional point. The petitioner's asylum application was filed five years after their entry into the United States. And the facts of this case are almost identical to those in Gasparin, which we cite in our 28-J letter. In that case, the alien testified that she did not. But let's just focus on the male petitioner because she succeeded as to the female petitioner. He never testified that he knew. But they were both derivatives of each other's asylum applications. And the testimony, she was testifying on behalf of his application just like he was testifying on behalf of her application. And I think that the facts bear out that both petitioners did not know about asylum law or one of them would have filed the asylum application. It wasn't just that his wife did not know about asylum law. Mr. Sumolong never mentioned the death of his child in his written asylum application. And he never claimed that that was the reason he didn't file for his asylum application until his hearing in 2006. The immigration judge found that the testimony of both petitioners established that there was a factual dispute as to why the application was untimely filed. Well, what's the conflicting evidence that you or that the government introduced to refute his statement that the reason I didn't file is that I was too traumatized mentally to even revisit all that I had gone through? Well, it was his wife's testimony that we didn't know about asylum law and we didn't know that there was a one-year filing deadline. So the wife's testimony can be imputed to the? Well, the wife was testifying on behalf of his application as well as on behalf of her application. It wasn't two separate applications, but they were both derivatives of each other's applications and were presented as witnesses for both asylum applications. But even if the court were to find that it has jurisdiction and there are no disputed facts, the immigration judge reasonably found that petitioners failed to show that there were extraordinary circumstances. Most significantly, the petitioners were able to file to extend their visas in 1998 after they heard that there was increasing violence in their home country. They also had a second child and testified that they were able to take care of the child. And significantly, the letter from the psychologist makes no mention of the death of their child. So even if they were experiencing post-traumatic stress disorder from the death in 1996, because they were able to cure their immigration status and extend their visa, there's no indication that they couldn't file for asylum. And I don't think that anything in the record would compel a finding that they were – that the situation was so extraordinary that they were unable to file for asylum. With regard to the changed country conditions, the government contends that there's also a dispute of what caused the delayed filing, and the court would lack jurisdiction over this disputed fact determination. Petitioners testified, again, that they did not file because conditions worsened. However, the significant – they also testified that they didn't know about asylum loans, so the same factual findings would hold true for changed country conditions. But even, again, if the court were to find that it has jurisdiction, they came in 1997 due to harm. And the significant event, and the event that they emphasized in their brief to the board, was that in May 1998 there were riots in Indonesia. Their family told them it was unsafe to return to their home country, and they extended their visa as a result. Yet they didn't file for asylum until 2002. The cases in which this court has found changed country conditions to excuse the delayed filing are cases where the alien files six months to a year after the significant change in events. And here they waited almost four entire years before seeking asylum. Petitioners contend that there was violence in 2001, but again the significant event was 1998 where they made the affirmative choice to extend their visas. And the events in 2001 were in Sulawesi, which is Mr. Sumalong's hometown, but they were living in Jakarta at the time. And so the significance of the 1998 riots in Jakarta would really be what would materially affect their asylum application. But why wouldn't – I mean, I could easily read the record to suggest that they were hoping to go back. They obviously realized that things had gotten really bad in 1998, hoping that things would improve. But by the time 2001 came around, they realized, you know, this isn't going to get better for us, and we're going to have to stay, so now let's file for asylum. And, well, the violence in 2001, I believe, was in the summer of 2001. And, again, they waited more than seven months to file their asylum application until February 2002. And this court presumptively holds that six months is a reasonable time within the change of country conditions. And although it's on a case-by-case basis, given the entire picture of what was happening in Indonesia, they knew things were bad in 1996 when they left – or 1996 when they were in Indonesia. Things got worse after they left in 1997 and significantly worse in 1998. Yet they waited five years to file their asylum application, and that's unreasonable under the circumstances. But I think, again, looking at the big picture, if you look at all this testimony, they said, oh, we didn't file in time because our daughter had died in Indonesia, and things, you know, weren't that bad when we left Indonesia, and they significantly worsened. But they also testified that they didn't know about asylum law. And I think that looking at the facts as a whole, the more reasonable conclusion from the record is that they didn't know about asylum law. They didn't know that they had to file within one year, and that is what the immigration judge and board found was the reason that they didn't file until 2002. Roberts. So we still have jurisdiction. We would still have jurisdiction over withholding, correct? Correct, Your Honor. So. Turning to the. As I understand the I.J.'s decision, there was no adverse credibility finding with respect to the female applicant. Correct, Your Honor. Is that correct? That's correct. And so there was an adverse credibility finding with respect to the male.  Is that correct? So there were the I.J. identified, I think, two or three main points. Yes. And turning to address the adverse credibility determination, Mr. Sumulong enhanced his asylum claim every single time he presented it. He, it was a vague, his testimony was vague. His claim was based on really one arrest in Indonesia, and each time he told the story of arrest, it changed every single time. His written asylum application. This didn't seem like very significant inconsistencies or matters on which to discredit him completely. I think that if you take into account the fact that this was the only incident of harm on which he was basing his claim was this arrest. Well, he's also including his daughter, the death of his daughter as well. Correct, but there were problems with his account of the death of his daughter, but also the fact that each time he told the story of the arrest, he enhanced it. First, he said, I was not given any food. I was not given any water. But my family members came, and they gave me food and water, and that's how I survived. Then when he testified four years later, he said, oh, I was given food, and I was given bad water, but I wasn't, I can't remember any other mistreatment. And then he specifically What's the difference between given water that you can't, I mean, food that you can't eat and water you can't drink and not being given any food and water? Well, I think that the significant part is that he specifically testified that his family members came to the jail and tried to give him food, and they were turned away. They weren't permitted to come into the jail. When in his written asylum application, he said, but for the food for my family, I would have died in prison. So, I mean, that is a significant inconsistency. And a year and a half later, on redirect examination, he added for the first time that he was beaten with a stick. And while on the face this might seem insignificant, minor enhancements, given the fact that this is the one arrest that he experienced in Indonesia, it is significant. And the death of his daughter and all the uncertainties surrounding the death certificate, I think, do not enhance his otherwise incredible claim. He testified that his daughter died when she was three months old due to neglect from the doctor. However, the death certificate itself states that the daughter died on the day she was born and died during childbirth. Do you think the birth certificate was forged? It's unclear, and I think the agency didn't know what to believe. And he blamed it on sloppy books. What basis did the I.J. have for not believing that she was actually born on the date stated on the birth certificate? Because it's inconsistent with the date on the death certificate. So either they – But the I.J. speculated that, well, recordkeeping must be terrible in Indonesia. No. That was the Petitioner's explanation. But then if you have a – they said ignore these parts of the birth certificate that have errors, the fact that it said they were a married couple and whatever, and ignore these parts of the death certificate that say her birthday was this date and she died during childbirth. So it left the agency unclear what parts. If it's due to sloppy bookkeeping, as Petitioner's claimed, the agency didn't know what to believe because they were asking the immigration judge to discredit parts of documents and not other documents. And so those documents didn't corroborate his otherwise questionable claim. And with regard to the wife's claim that the death of their child was persecution of her, I think that the record was devoid of any evidence that the doctor in providing poor medical treatment was attempting to persecute her on account of a ground. But they testified that they were specifically told, you're going to wait because you're either Chinese or Christian, and that's why we're not treating you immediately, and that that's why the child died. Well, there's no real indication of why the child died. And if it was just poor medical treatment or the fact that it's an Indonesian state-run hospital that provides poor medical treatment. Again, the death certificate said the child died in childbirth. So it's unclear what happened. And although the doctor said, oh, you're going to wait, well, that's discrimination. But I don't think that there's any evidence that the doctor intended for the child to die solely because. But if we were to disagree with the IJ's credibility determination, what do we do? I believe the Court would have to remand since the bases of the two Petitioner's claims are different. And the merits of Mr. Simulang's claim were not addressed by the agency. And so it would have to go back for withholding. Does the BIA's case law foreclose consideration of the death of the child in this kind of situation or of a family member? I don't think that the immigration judge and board were saying that death of a child can never constitute persecution of the parents. I think that they were the – if you read the IJ's decision, it says that the death of a child in this case doesn't constitute persecution of the parents because there wasn't evidence just by saying, oh, you Chinese people, you always want to jump to the front of the line and, you know, you have to wait, you have to wait until I'm ready for you. Whether the doctor truly intended that their child would die under the circumstances, I just don't think that there's any evidence establishing that. And Petitioners didn't provide any letters from family or anything to corroborate their claim. I think it's notable that Ms. Notarejo's asylum application was filed after the Real ID Act, so there's no presumption of credibility. It's a post-2005 application. And so the mere fact that, you know, you don't have to credit everything she says is true because it's a post-Real ID Act case. And the mere fact that they told her she had to wait in line because she was Chinese and because she was Christian I don't think establishes that the doctor intended for their child to die and it wasn't just sloppy medical treatment. Okay. Any other questions? Thank you, Your Honor. Okay, thank you. Thank you. Do we have a new? Yes, Your Honor. A new advocate. Police Court. My name is Kelly Costello. I wanted to first address the government's contentions regarding the adverse credibility findings. The government contended that Petitioner enhanced his asylum claim every time that he came before the court. However, this can be explained by the undisputed letter that we have from the psychologist showing that he was suffering from post-traumatic stress disorder. He was unable to talk about his problems even with a professional. So when he was originally filing his application, he was filing pro se and working only with an interpreter to file his declaration. He did not want to discuss the harms that had befallen him in Indonesia. When he was first in court, he also showed signs that he did not want to discuss it, even going so far as to say that he couldn't discuss his daughter's death. It was still very emotional to him ten years after the fact. And as PTSD is a disorder that comes and goes in phases, you don't know what's going to trigger it. So he was able to later on discuss it as he got further away from the event. So when he was discussing his jail time and his second testimony, that's when he was finally able to discuss that he was beaten by the police because he was jailed for a parking violation. But to discuss the one-year issue and whether or not you have jurisdiction, like we discussed originally, the mail Petitioner never said. Do you agree with the government that if we were to disagree with the IJ's credibility determination that the whole matter goes back to the BIA? Yes, Your Honor, because the IJ found him not credible. His testimony was not given any weight in the determination of the case at the IJ or at the BIA. So if you found him credible, the case would need to be remanded so that the testimony could be given its proper weight. I also wanted to point out that for the changed circumstances, the government said that the treatment of Petitioners in 2001 happened in the summer and then they didn't file until February. However, the events occurred on December 1st, 2001, and then they filed in February. So it was within three months of the event. Okay. Time is up. Thank you, Your Honor. Thank you. Thank you, Counsel. I appreciate your arguments. The matter Sumong v. Holder is submitted at this time.
judges: Kennelly, Paez, Watford